1  JOSEPH P. RUSSONIELLO (CASBN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CASBN 163973)
3  Chief, Criminal Division

4  ROBERT DAVID REES (CASBN 229441)
   Assistant United States Attorney
5
      450 Golden Gate Avenue, 11th Floor
6     San Francisco, California 94102
      Telephone: (415) 436-7210
7     Facsimile: (415) 436-7234
      Email: robert.rees@usdoj.gov
8
   Attorneys for Plaintiff
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,      )    No. 3 08 70407 MEJ
                                   )
14        Plaintiff,               )
                                   )
15  v.                             )    **UNITED STATES' STATEMENT
                                   )    RE: OUT OF DISTRICT ARREST
                                   )    AND *FARETTA* RIGHTS**
16  MARVIN R. HICKS,               )
      a/k/a Randy Smith,           )
17                                 )    Hearing:    July 8, 2008
          Defendant.              )     Time:       9:30AM
18                                 )    Court:      Hon. Nandor J. Vadas
    _____ )
19

20                  **I. INTRODUCTION**

21        On July 3, 2008, defendant Marvin R. Hicks was arrested in the Northern District

22  of California on a warrant issued via judicial order of the Honorable Wesley E. Brown

23  from the District of Kansas.  That order was issued because Hicks failed to appear for a

24  judicially ordered hearing on June 30, 2008 for pending charges he faces in the District of

25  Kansas.  On July 7, 2008, the defendant made his initial appearance before the Honorable

26  Nandor J. Vadas for proceedings on an out-of-district arrest under Fed. R. Crim. P.

27  5(c)(3).  Through specially appointed counsel Ron Tyler of the Federal Public Defender's

28  office, Hicks indicated that he wanted to represent himself in these Rule 5 proceedings.

However, the defendant never clearly stated that it was his desire to represent himself, despite multiple direct questions from the Court on the subject.  The following statement outlines issue relating to these continued proceedings.

## II.  STATEMENT

### A.  Rule 5 Procedures

Fed. R. Crim. P. 5(c)(3) sets forth the "Procedures in a District Other Than Where the Offense Was Allegedly Committed."  These provisions may not strictly apply to this case given Hicks's current arrest did not directly arise from new criminal charges.  Rather, Judge Brown in Kansas issued an arrest warrant by judicial order because Hicks failed to appear as ordered on proceedings related to a second superseding indictment pending there.  Nevertheless, in an abundance of caution, it makes sense to adhere to the procedures outlined in Rule 5(c)(3)(A)–(E) as closely as possible in these circumstances.

*Rule 5(c)(3)(A)*:  This provision states that the magistrate judge must inform the defendant about the provisions of Rule 20.  Because of the unusual procedural posture set forth above, it is unclear whether Hicks could plead guilty to the underlying charges pursuant to Rule 20 given that he is not before the court upon arrest for those charges.  What he is before the Court for—failure to appear resulting in potential revocation of his pretrial release—is not something one can plead "guilty" to because his abscondment is not currently charged as a separate crime.  Nevertheless, the United States suggests that the Court inform Hicks that he *may* be able to plead guilty to the underlying charges in this district, and if Hicks expresses interest in that option, set the matter over for further briefing.

*Rule 5(c)(3)(B)*:  This provision only applies when a defendant is arrested without a warrant.  Because Hicks's arrest was pursuant to a warrant from the District of Kansas, that provision is inapplicable here.

*Rule 5(c)(3)(C)*:  This provision states that the magistrate must conduct a preliminary hearing if one is required by Rule 5.1.  This is inapplicable as well:  The

defendant's instant arrest is not based on newly charged criminal conduct, and he has been indicted on the underlying charges, making a preliminary hearing unnecessary. *See* Rule 5.1(a)(2).

*Rule 5(c)(3)(D)*:  Other than adjudicating the matter of detention, this provision is essentially the final step in the process.[1]  It states that the magistrate judge "must transfer the defendant to the district where the offense was allegedly committed" if:  (i) the government produces the warrant, a certified copy of the warrant, or a reliable electronic form of either; and (ii) the judge finds that the defendant is the same person named in the indictment, information, or warrant."  The United States has already produced a copy of the warrant, and it is available electronically as an attachment to the Rule 5 notice e-filed this morning in the above-captioned case.  All that remains, then, would be a potential identification hearing.  If the defendant desires such a hearing, the United States would request a continuance in the matter so as to secure witness(es) from the District of Kansas to identify Hicks.

**B.  *Ferretta* Issues**

As noted above, the defendant indicated through specially appointed counsel Ron Tyler that he wished to represent himself in these proceedings, although he refused to unequivocally confirm that desire himself.  Should the defendant express an unequivocal desire to represent himself for purposes of the proceedings in this district, the United States submits the following thoughts.

**1. Ferretta *Rights Are Subject to Forfeiture***

Although a defendant has a Sixth Amendment right to represent himself,[2] *see*

---

[1] Rule 5(c)(3)(E), the last subpart of Rule 5(c)(3), is a housekeeping provision that directs the clerk of the court to transfer files along with a defendant if his or her transfer is ordered.

[2] The results of a westlaw search suggest that no court has directly confronted the question of whether someone has a *Ferretta* right to represent him or herself at a limited Rule 5(c)(3) proceeding such as this one.  Without conceding the issue, it seems appropriate, in an abundance of caution, to proceed on the assumption that a Hicks has such a right.

1   *Faretta v. California*, 422 U.S. 806, 818–34 (1975), the defendant may forfeit that right

2   when he or she "is not able and willing to abide by rules or procedure and courtroom

3   protocol." *United States v. Lopez-Osuna*, 232 F.3d 657, 665 (9th Cir. 2000); *see also*

4   *United States v. Causey*, 835 F.2d 1289, 1293 (9th Cir. 1987) (appointment of stand-by

5   counsel particularly appropriate where court is concerned about orderly conduct of trial);

6   *United States v. Flewitt*, 874 F.2d 669, 674-75 (9th Cir. 1989) ("defendant's right to

7   self-representation does not allow him to engage in uncontrollable and disruptive

8   behavior in the courtroom").

9         The appropriate remedy where a defendant exhibits disruptive or obstructionist

10  behavior relating to his representation is for standby counsel to assume representation.

11  "A defendant does not forfeit his right to representation at trial when he acts out.  He

12  merely forfeits his right to represent himself in the proceeding." *United States v. Mack*,

13  362 F.3d 597, 599, 601 (9th Cir. 2004) (noting that failure to appoint standby counsel was

14  "regrettable" and suggesting that standby counsel should have been appointed to prevent

15  reversal); *Badger v. Cardwell*, 587 F.2d 968, 976 (9th Cir. 1978) (reversing conviction

16  for removing pro se defendant from courtroom for disruptive conduct and noting that

17  relieving defendant from role of representing himself would have been appropriate

18  remedy for his disruptive conduct).

19        Here, Hicks has already displayed disruptive and obstructionist behavior in court,

20  failing on numerous occasions to answer simple, direct questions posed by the Court.

21  The United States' position is that if such conduct continues, this Court should rule that

22  the defendant will have forfeited any *Ferretta* rights he may have during these limited

23  proceedings and appoint Ron Tyler as Hicks's counsel.  At that point, these proceedings

24  could proceed in an orderly fashion.

25        ### *2.  The Defendant Should Be Advised of the Following* **Faretta** *Admonishments*

26        If the defendant is able to cease his obstructionist conduct and is able to provide

27  straight answers to the Court, the United States is of the view that he should be provided

28  with as complete a set of *Faretta* admonishments as possible, even if some aspects of the

1   typical *Faretta* warnings may not strictly apply to the case.

2       The Ninth Circuit does not prescribe any specific script for courts to use when

3   holding a *Faretta* hearing.  *United States v. Keen*, 104 F.3d 1111, 1114 (9th Cir. 1996).

4   However, in order to deem a defendant's waiver of counsel knowing and intelligent, the

5   Ninth Circuit has held that the defendant must understand "1) the nature of the charges

6   against him, 2) the possible penalties, and 3) the 'dangers and disadvantages of

7   self-representation.'"  *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004)

8   (*quoting United States v. Balough*, 820 F.2d 1485, 1487 (9th Cir. 1987)).

9       **a.  The Nature of the Charges and Possible Penalties**

10      The jurisdiction of this Court is highly limited.  As noted above, if the United

11  States produces a copy of the warrant and the Court is satisfied that Hicks is the person

12  named in the warrant, the Court "*must* transfer the defendant to the district where the

13  offense was allegedly committed." Fed. R. Crim. P. 5(c)(3)(D) (emphasis added).

14  Accordingly, any *Ferretta* waiver obtained in this case would *not* apply to the underlying

15  case pending in the District of Kansas—only to the limited proceedings here.  The

16  defendant should be instructed first and foremost that if he wishes to represent himself in

17  his case in Kansas, this Court has no authority to grant such a request, and any such

18  request must be made before Judge Brown in Kansas.

19      As a result, the first part of the *Feretta* warnings about the nature of the charges

20  against him is highly limited in this case as well:  the nature of the "charges" pending

21  against him for purposes of these limited proceedings is essentially the allegation in the

22  warrant that he failed to appear as ordered in Kansas, and that an arrest warrant issued

23  upon order of Judge Brown as a result.  The second part of the *Ferretta* admonishments is

24  likewise limited, as the "possible penalties" of these proceedings are that if he is

25  identified as the person in the warrant, he will be ordered back to Kansas, and that there

26  will be a hearing to determine whether that journey will be undertaken in or out of

27  custody.  Additionally, the United States submits that it is prudent to inform the defendant

28  generally of the procedures specified in Rule 5(c)(3), as set forth at the beginning of this

1  document, as well as a brief explanation of the standard for bail vs. detention under the

2  Bail Reform Act in these circumstances.

3      However, in an abundance of caution, the United States suggests that this Court

4  also advise the defendant of the nature of the *underlying* charges against him, and the

5  possible penalties for those.  Though probably not necessary, there is little to be lost in

6  over-admonishing the defendant.  Accordingly, the Court could explain the following

7  charges and maximum penalties relating to the underlying charges faced by the defendant.

8  *See* Exhibit 1 (Second Superseding Indictment).

9      *Count One*:  Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §
10  371, related to the defendant's agreement to be involved in a fraudulent scheme for
    obtaining money or property by means of false or fraudulent pretenses,
11  representations, or promises through his dealings with an organization known as
    "PBS," as set out more fully in the second superseding indictment.  The elements
12  of that offense are:  First, beginning on or about a particular date, and ending on or
    about another later date, there was an agreement between two or more persons to
13  commit a violation of 18 U.S.C. § 1343 as charged in the second superseding
    indictment; second, the defendant became a member of the conspiracy knowing of
14  at least one of its objects and intending to help accomplish it; and third, one of the
    members of the conspiracy performed at least one overt act for the purpose of
15  carrying out the conspiracy.  This crime carries maximum penalties of up to 5
    years in prison, up to a $250,000 fine, up to 3 years of supervised release, and a
16  $100 special assessment.

17      *Count Sixteen*:  Wire Fraud, in violation of 18 U.S.C. § 1343, related to the
    defendant's involvement in a fraudulent scheme for obtaining money or property
18  by means of false or fraudulent pretenses, representations, or promises through his
    dealings with an organization known as "PBS" and involving a telephone call, as
19  set out more fully in the second superseding indictment.  The elements of that
    offense are:  First, the defendant made up a scheme or plan for obtaining money or
20  property by means of false or fraudulent pretenses, representations, or promises;
    second, the defendant knew that the promises or statements were false; third, the
21  promises or statements were material, that is they would reasonably influence a
    person to party with money or property; fourth, the defendant acted with intent to
22  defraud; and fifth, the defendant used, or caused to be used, a wire to carry out or
    attempt to carry out an essential part of the scheme.  This crime carries maximum
23  penalties of up to 20 years in prison, up to a $250,000 fine, up to 3 years of
    supervised release, and a $100 special assessment.

24

25      *Count Seventeen*:  Wire Fraud, in violation of 18 U.S.C. § 1343, related to
    the defendant's involvement in a fraudulent scheme for obtaining money or
26  property by means of false or fraudulent pretenses, representations, or promises
    through his dealings with an organization known as "PBS" and involving a
27  telephone call, as set out more fully in the second superseding indictment.  The
    elements of that offense are:  First, the defendant made up a scheme or plan for
28  obtaining money or property by means of false or fraudulent pretenses,
    representations, or promises; second, the defendant knew that the promises or

statements were false; third, the promises or statements were material, that is they would reasonably influence a person to party with money or property; fourth, the defendant acted with intent to defraud; and fifth, the defendant used, or caused to be used, a wire to carry out or attempt to carry out an essential part of the scheme. This crime carries maximum penalties of up to 20 years in prison, up to a $250,000 fine, up to 3 years of supervised release, and a $100 special assessment.

*Count Eighteen*:  Wire Fraud, in violation of 18 U.S.C. § 1343, related to the defendant's involvement in a fraudulent scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises through his dealings with an organization known as "PBS" and involving a telephone call, as set out more fully in the second superseding indictment.  The elements of that offense are:  First, the defendant made up a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; second, the defendant knew that the promises or statements were false; third, the promises or statements were material, that is they would reasonably influence a person to party with money or property; fourth, the defendant acted with intent to defraud; and fifth, the defendant used, or caused to be used, a wire to carry out or attempt to carry out an essential part of the scheme. This crime carries maximum penalties of up to 20 years in prison, up to a $250,000 fine, up to 3 years of supervised release, and a $100 special assessment.

*Count Nineteen*:  Wire Fraud, in violation of 18 U.S.C. § 1343, related to the defendant's involvement in a fraudulent scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises through his dealings with an organization known as "PBS" and involving a telephone call, as set out more fully in the second superseding indictment.  The elements of that offense are:  First, the defendant made up a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; second, the defendant knew that the promises or statements were false; third, the promises or statements were material, that is they would reasonably influence a person to party with money or property; fourth, the defendant acted with intent to defraud; and fifth, the defendant used, or caused to be used, a wire to carry out or attempt to carry out an essential part of the scheme. This crime carries maximum penalties of up to 20 years in prison, up to a $250,000 fine, up to 3 years of supervised release, and a $100 special assessment.

*Count Twenty*:  Wire Fraud, in violation of 18 U.S.C. § 1343, related to the defendant's involvement in a fraudulent scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises through his dealings with an organization known as "PBS" and involving a telephone call, as set out more fully in the second superseding indictment.  The elements of that offense are:  First, the defendant made up a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; second, the defendant knew that the promises or statements were false; third, the promises or statements were material, that is they would reasonably influence a person to party with money or property; fourth, the defendant acted with intent to defraud; and fifth, the defendant used, or caused to be used, a wire to carry out or attempt to carry out an essential part of the scheme. This crime carries maximum penalties of up to 20 years in prison, up to a $250,000 fine, up to 3 years of supervised release, and a $100 special assessment.

*Count Thirty-Five*:  Conspiracy to Commit Money Laundering—Promotion, in violation of 18 U.S.C. § 1956(h), related to the defendant's agreement to be involved in financial transactions using proceeds of specified unlawful activity with intent to promote the carrying on of specified unlawful activity through his dealings with an organization known as "PBS," as set out more fully in the second superseding indictment.  The elements of that offense are:  First, beginning on or about a particular date, and ending on or about another later date, there was an agreement between two or more persons to commit a violation of 18 U.S.C. § 1956 as charged in the second superseding indictment; and second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.  This crime carries maximum penalties of up to 20 years in prison, the greater of up to a $500,000 fine or twice the value of the property involved in the transactions, up to 3 years of supervised release, and a $100 special assessment.

### b.  The Dangers and Disadvantages of Self-Representation

To satisfy the third *Feretta* requirement, a defendant must understand the "dangers and disadvantages" of representing himself.  The Ninth Circuit has given the following model language for this issue:

> The court will now tell you about some of the dangers and disadvantages of representing yourself.  You will have to abide by the same rules in court as lawyers do.  Even if you make mistakes, you will be given no special privileges or benefits, and the judge will not help you.  The government is represented by a trained, skilled prosecutor who is experienced in criminal law and court procedures.  Unlike the prosecutor you will face in this case, you will be exposed to the dangers and disadvantages of not knowing the complexities of jury selection, what constitutes a permissible opening statement to the jury, what is admissible evidence, what is appropriate direct and cross examination of witnesses, what motions you must make and when to make them during the trial to permit you to make post-trial motions and protect your rights on appeal, and what constitutes appropriate closing argument to the jury.

*United States v. Hayes*, 231 F.3d 1132, 1138–39 (9th Cir. 2000).  The court prefaced this instruction by saying that the explanation "should not be as complex and rigid as is now required in the taking of a guilty plea," *id.* at 1138, and later repeated, "[w]e emphasize that the foregoing formula is not required to be used verbatim."  *Id.* at 1139.

For a *Faretta* waiver to be valid, the defendant must understand the charges against him, the possible penalties, and the "dangers and disadvantages" of waiving counsel "at the particular stage of the proceedings at which he purportedly waived his right to counsel." *Erskine*, 355 F.3d at 1169.  Accordingly, this Court may want to modify the above admonishment to apply more specifically to the procedures surrounding a

detention hearing and an identification hearing at issue here, as opposed to the full blown trial discussed in *Hayes*.  That is because these are the only proceedings this Court has jurisdiction to conduct, and thus are the only issues over which any right of self-representation can be granted at this time.

### III.  CONCLUSION

The United States respectfully submits the foregoing statement regarding issues that may arise during tomorrow's continuation of proceedings in this matter..

DATED:  July 7, 2008                    Respectfully submitted,

                                        JOSEPH P. RUSSONIELLO
                                        United States Attorney


                                        _____/s_____
                                        ROBERT DAVID REES
                                        Assistant United States Attorney

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

'08 MAR -5 AM 11 :36

CLERK, U.S. DISTRICT COURT
BY DEPUTY CLERK
AT WICHITA. KS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action |
| | ) | |
| v. | ) | No. 07-10180-01-08, WEB |
| | ) | |
| RICHARD A. HAGAN, | ) | |
| BRIAN P. RENNEISEN, a/k/a BRIAN MEADOWS, | ) | |
| JOHN R. PERSAUD, a/k/a JOHN CASMERE a/ka | ) | |
| JOHN KASHMIRE, | ) | |
| CHERI L. PERSAUD, | ) | |
| SHAUN A. SMOKER, a/k/a ANTHONY SAUNDERS, | ) | |
| ANDREW S. WANG, a/k/a ANDY LEE, | ) | |
| MARVIN R. HICKS, a/k/a RANDY SMITH, and | ) | |
| BRANDON COOK. | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND SUPERCEDING INDICTMENT

The Grand Jury Charges:

## INTRODUCTION
## PRUDENTIAL BUSINESS SERVICES
## and
## PBS GLOBAL, INC.

1.      Beginning on a date unknown to the Grand Jury but continuing through

September 25, 2006,

### RICHARD A. HAGAN, BRIAN P. RENNEISEN,
### JOHN R. PERSAUD, and CHERI L. PERSAUD,

entered into an agreement, conspiracy and scheme to defraud individuals and business entities of

money.  Defendants,

1

**ANDREW S. WANG, MARVIN R. HICKS, and SHAUN A. SMOKER,**

joined the conspiracy in or about June of 2003. In June of 2004, Defendants

**ANDREW S. WANG, MARVIN R. HICKS, and SHAUN A. SMOKER,**

quit working for PBS and started their own business which operated in a substantially similar

manner to PBS, as set forth below.

2.      HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD agreed to form a

business which would be known as Prudential Business Systems, to be located in Melbourne,

Florida, which was an attempt to draw upon the name recognition of The Prudential Life

Insurance Company of America and Prudential Financial.

3.      In the fall of 2003, Prudential Insurance Company and Prudential Financial made

formal demand upon Prudential Business Services to cease using the name Prudential Business

Services, claiming trade mark infringement. As a result, in early 2004, Prudential Business

Services changed its name to PBS Global, Inc.

4.      Prudential Business Services and PBS Global, Inc, are hereinafter described as

PBS.

5.      In 2003, HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD agreed that:

a.      RICHARD A. HAGAN would serve as the President and Chief Executive

Officer of PBS,

b.      BRIAN P. RENNEISEN would be the Chief Financial Officer,

c.      JOHN R. PERSAUD would serve as the Director of Sales, and

2

d.    CHERI L. PERSAUD would be an investor in PBS but have no official position in PBS, however, at various times CHERI L. PERSAUD was referred to as the Vice President of Sales of PBS.

6.    Beginning in or about June of 2003, PBS caused thousands of unsolicited faxes to be sent to small businesses throughout the United States in a method known as "fax blasting."

7.    The unsolicited fax described in paragraph 6 would typically represent that:

a.    The sender of the fax was "the Nation's Top Service in locating qualified businesses for a select group of serious buyers and investors worldwide,"

b.    The recipient was being contacted because "our qualified business buyers and investors have asked us to find businesses," in "your area which match your business profile,"

c.    There was a "guarantee" of a "qualified buyer or investor"and the recipient was provided a toll free telephone and fax number to contact if the recipient was interested in the offer.

8.    If a recipient responded, an appointment setter, hired by PBS, would arrange a meeting between the recipient and a PBS "Business Analyst." Contact between the appointment setter and the recipient was via telephone.

9.    Appointment setters were retained and trained by PBS. The training would consist of the appointment setter following a script which was provided by PBS and which had been created by HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD.

10.    The appointment setter would typically inform the fax recipient that PBS had been contacted by buyers interested in the recipient's type of business and in the recipient's general

3

geographic area and then verify that Seller Client was interested in selling. If the recipient indicated an interest in selling, an appointment with a PBS Business Analyst was scheduled.

11.    After the appointment was scheduled, the appointment setter would advise the PBS Business Analyst of the appointment and, thereafter, the fax recipients were known as Seller Clients.

12.    HAGAN, RENNEISEN, and J. PERSAUD recruited and hired SHAUN A. SMOKER, ANDREW S. WANG, MARVIN R. HICKS, and others to serve as business analysts for PBS.

13.    SMOKER, WANG, HICKS, and the other PBS Business Analysts were trained by J. PERSAUD. Training sessions were conducted several times a year by J. PERSAUD. HAGAN, and RENNEISEN were present at these training sessions. In addition, weekly telephone conferences were held by PBS between its Business Analysts and J. PERSAUD. HAGAN and RENNEISEN typically participated during these telephone conferences.

14.    PBS provided its Business Analysts with written documents and instructed its Business Analysts to send these documents to the fax recipients via mail or fax. These documents included the following;

      a.    Preparing For The Business Analysis,

      b.    Commonly Asked Questions, and

      c.    Confidentiality and Privacy Pledge.

These documents were identified by PBS as the "pre-application documents."

4

15.    PBS trained its Business Analysts to orally inform the Seller Client that PBS had been contacted by a buyer interested in purchasing the type of business owned by the Seller Clients and was also interested in the geographic area in which the Seller Client was located.

16.    PBS provided its Business Analysts with a contract to be used in the transactions with its Seller Clients.

17.    The PBS contract provided, in pertinent part, that:

a.    PBS would market the Seller Client's business and prepare a "Profile" of the Seller Client's business to be used in the marketing of the business;

b.    The Seller Client would pay:

i.    a designated sum to PBS  for PBS acting as an intermediary with buyers, advertising expenses and other business services;

ii.    a designated sum for the hiring of an independent firm to prepare a Valuation of the seller client's business; and

iii.    another designated sum for the successful matching of the Seller's business with a buyer, this latter sum would be due two days after the sale or transfer of the business.

c.    PBS offered a "100% money back guarantee" if Seller Client had paid, in full, monies due PBS and had provided PBS with the required documentation; and

d.    PBS would refund the money paid by the Seller Client if PBS had not introduced at least one qualified buyer to the Seller Client within one year of the date of the agreement.

5

18.    PBS defined a qualified buyer, in its contract and the other documents PBS

provided to a Seller Client, as:

      a.    Someone "who represents to PBS that they are interested the general type

of business, terms, general location and price category" of the Seller Client;

      b.    Someone who had signed a "non-disclosure and non-circumvent agreement

to protect" the Seller Client's confidentiality; and

      c.    Someone who was not a "tirekicker."

19.    PBS documents provided to its Seller Clients represented to the Seller Client that

PBS performed a due diligence check on potential buyers prior to the Seller Client being matched

with the buyer.

20.    The documents provided by PBS to its Seller Clients represented, in pertinent part,

that:

      a.    PBS performed a "due diligence" on the Seller Client's business prior to

the meeting with the Business Analyst;

      b.    PBS had never had any complaints filed against it with the Better Business

Bureau;

      c.    The due diligence conducted by PBS is "similar to one that a buyer or

investor" would conduct, most of which would be conducted prior to the on-site

analysis by the Business Analyst;

      d.    Only one out of every three businesses which have an on-site analysis, i.e. a

meeting with the Business Analyst, would "be invited into the (PBS) process;"

      e.    PBS does not work with everyone who wants to sell;

6

f.      PBS gets paid a small fee on "the successful completion of the buy/sell transaction ... Because of the high volume of successful matching, the fees are a fraction of other alternatives. PBS's success rate is by far the highest in the industry;"

g.      PBS guarantees "a refund" if unsuccessful in matching the Seller Client with a qualified buyer; and

h.      PBS pays the Business Analyst for the meeting with the Seller Client.

21.      In actuality, despite the language of its contract and the representations made in the documents provided to its Seller Clients, very little money was received by PBS from completed buy/sale transactions and the vast majority of the money paid by the Seller Clients to PBS for the independent third party business valuation was used by PBS to pay for the operating expenses of PBS and to the benefit of the Defendants herein.

22.      In an effort to appear to comply with its guarantee, PBS would send a match letter to a Seller Client and use this "match" to claim that it had provided the Seller Client with a qualified buyer pursuant to its contract, however, typically, the "match" was a sham, in that, the alleged qualified buyer would show no indication of interest in the Seller Client's type of business, or in the geographic location of the Seller Client's business, and otherwise did not meet the definition of qualified buyer, as provided in the PBS contract and documents.

23.      Despite the representations contained within the PBS documents that PBS earned its fees and profits from completed buy/sell transactions, more than 98% of PBS's earnings were generated from the fees collected for the independent third party business valuations.

a.      Between June of 2003 and December 2005:

7

i.      PBS had total income of approximately $18,483,018.73, of which approximately $293,392.45 was the result of completed buy/sell transactions (back-end commissions);

ii.     the $293,392.45 was generated from the sale of approximately twenty-five businesses. In  contrast, PBS generated approximately $18,189,626.00 of income from more than 3,000 Seller Clients for the purchase of independent third party valuations;

iii.    PBS paid approximately $736,796.39 for companies to prepare the business valuations for PBS Seller Clients, but paid approximately $5,804,990.00 in salary, commissions and dividends to Defendants, HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD or corporations which they owned and controlled; and

iv.     the Business Analysts of PBS were actually paid a commission of approximately 35 to 40% of any moneys collected from a Seller Client.  If no money was collected the Business Analyst was paid nothing.

### COUNT ONE
### CONSPIRACY TO COMMIT WIRE FRAUD

24.     The Grand Jury incorporates by reference paragraphs 1 through 23 as though fully set forth herein.

25.     Beginning in or about 2003, and continuing through June of 2004, the exact dates being unknown to the Grand Jury, in the District of Kansas and elsewhere, the Defendants,

RICHARD A. HAGAN, BRIAN P. RENNEISEN, JOHN R. PERSAUD, CHERI L. PERSAUD,
SHAUN A. SMOKER, ANDREW S. WANG, and MARVIN R. HICKS, knowingly and willfully
combined, conspired, confederated and agreed with each other and with other persons, both known
and unknown to the Grand Jury to commit offenses against the United States, that is:

        a.     To devise a scheme or artifice to defraud, for obtaining money or property
by means of false or fraudulent pretenses, representations, or promises and to
transmit or cause to be transmitted by means of wire, radio, or television
communication, in interstate commerce, any writings, signs, signals, pictures or
sounds for the purpose of executing such scheme or artifice, in violation of Title 18,
United States Code, §1343;

26.     In June of 2004, Defendants WANG, SMOKER, and HICKS, withdrew from the
PBS conspiracy mentioned above, but Defendants HAGAN, RENNEISEN, J. PERSAUD, and C.
PERSAUD continued the conspiracy involving PBS until at least September 25, 2005.

### Purpose of the Conspiracy

27.     A purpose of the conspiracy was to make money for the conspirators through a
scheme to defraud in which Defendants RICHARD A. HAGAN, BRIAN P. RENNEISEN, JOHN
R. PERSAUD, CHERI L. PERSAUD, SHAUN A. SMOKER, ANDREW S. WANG, and
MARVIN R. HICKS agreed to make and did make, and agreed to cause and did cause others to
make, false and fraudulent representations and promises, both oral and written, to individuals and
business entities.

9

**Manner and Means**

28.     The conspirators agreed to pay and did pay a person or business, to arrange for the fax blasting of a document informing businesses that qualified buyers were available to purchase the Seller Client's business and requesting the Seller Client to respond to the fax solicitation by telephone or via fax. One such person the Defendants agreed to hire for and who agreed to provide the previously described fax blasting was Defendant WANG, d/b/a OIGNA.

29.     After WANG withdrew from the conspiracy in June of 2004, until approximately March of 2005, Defendants, HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD, agreed to use a company formed by J. PERSAUD, known as Glenmary Corporation, and beginning in March of 2005, and continuing through November of 2005, Defendants, HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD, agreed to use a different company formed by J. PERSAUD, known as Global Business Acquisitions, to perform the fax blasting to potential Seller Clients.

30.     The conspirators agreed to pay and did pay persons to receive telephone calls or fax transmissions in response to the unsolicited faxes.

31.     Defendants, HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD, agreed to hire and did, or caused to be hired business analysts to meet and obtain money from the Seller Clients of PBS. These business analysts included; ANDREW WANG, MARVIN HICKS, SHAUNB SMOKER, BRANDON COOK, and others.

32.     In addition, Defendants HAGAN, RENNEISEN, and J. PERSAUD, also acted as a PBS business analyst and met with and obtained money from the Seller Clients of PBS.

10

33.     The Defendants, HAGAN, RENNEISEN, J. PERSAUD, WANG, HICKS, and

SMOKER agreed to use, and did use, each other, as well as other persons, as fraudulent references

for PBS:

> a.      HAGAN, RENNEISEN, J. PERSAUD, WANG, HICKS, and SMOKER
>
> agreed to receive, and did receive, telephone calls from prospective Seller Clients of
>
> PBS and represented to those Seller Clients that PBS had sold their respective
>
> businesses and that they were satisfied with the services of PBS; and
>
> b.      HAGAN, RENNEISEN, WANG, HICKS ,and SMOKER agreed to provide,
>
> and did provide, the telephone numbers of HAGAN, RENNEISEN, PERSAUD,
>
> WANG, HICKS, SMOKER, and others to prospective Seller Clients of PBS and
>
> represent that the telephone numbers provided to the Seller Clients were those of
>
> people who had sold their business through PBS, when in fact, HAGAN,
>
> RENNEISEN, J. PERSAUD, WANG, HICKS, SMOKER, and the other references
>
> had never owned a business which was sold by PBS.

34.     The Defendants, HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD, agreed

to name their business Prudential Business Service in an effort to shadow the name of Prudential

Life Insurance Company and Prudential Financial.

35.     In late 2003, or early 2004, in response to a demand letter sent by counsel for

Prudential Life Insurance Company and Prudential Financial, Defendants, HAGAN,

RENNEISEN, J. PERSAUD, and C. PERSAUD, agreed to change the name of Prudential

Business Services to PBS Global, Inc., however, PBS documents and PBS Business Analysts

continued to refer to PBS Global, Inc., as Prudential.

11

36.      Defendants, HAGAN, RENNEISEN, and J. PERSAUD, agreed to cause documents containing false and fraudulent representations and promises to be provided by PBS and its business analysts to the Seller Clients of PBS.  These documents include, but are not limited to the following; Preparing for the Business Analysis, Commonly Asked Questions, Confidentiality and Privacy Pledge and a document purporting to be from the Better Business Bureau of Central Florida.

37.      Defendants, HAGAN, RENNEISEN, and J. PERSAUD, agreed to cause PBS and its business analysts to falsely represent to Seller Clients that PBS would arrange for an independent third party business evaluation and that said business evaluation would meet the standards of the Small Business Administration, American Banking Association and the National Banking Association.

38.      Defendants, HAGAN, RENNEISEN, and J. PERSAUD, agreed to prepare, and did prepare, a contract containing false and fraudulent representations and promises for the Seller Clients of PBS.

39.      Defendants, HAGAN, RENNEISEN, J. PERSAUD, and C. PERSAUD, agreed to divide the profits from the fraudulent activities of PBS amongst themselves in a pre-determined fashion.

### Overt Acts

40.      In furtherance of the conspiracy and scheme and artifice to defraud, and to accomplish their purposes and objectives, one or more of the co-conspirators committed in the District of Kansas, and elsewhere, the following overt acts, among others:

12

a.      Began conducting a business under the name of Prudential Business

Services in an attempt to "shadow" the name of Prudential Life Insurance and

Prudential Financial.

b.      After receiving several cease and desist letters from Prudential Life

Insurance and Prudential Financial, the name of Prudential Business Services was

changed to PBS Global, Inc.

c.      Paid for a person or business to contact Seller Clients via "fax blasting."

d.      Hired appointment setters to schedule appointments, via telephone, for PBS

business analysts to meet Seller Clients, who contacted businesses in Kansas and

elsewhere.

e.      Recruited and hired business analysts to act on behalf of PBS, which

included Defendants, ANDY WANG, MARVIN HICKS, SHAUN SMOKER,

BRANDON COOK, and others.

f.      Defendants, HAGAN, RENNEISEN, and J. PERSAUD also acted as PBS

Business Analysts.

g.      Engaged in a false reference scheme.

h.      Sent, or caused to be sent, documents to Seller Clients which contained false

representations regarding:

       i.      The availability of "qualified buyers" in the Seller Client's industry

        and geographic area;

      ii.      The retention of an "independent third party" to conduct and prepare

        a business evaluation which conformed to the standards set by the

13

Small Business Administration, American Banking Association and National Banking Association;

iii.   The "100% money back guarantee" if a "qualified buyer, investor or capital funding source" was not provided to the Seller Client within one year of the contract date;

iv.   The reason the Seller Client's business was contacted on behalf of PBS;

v.    The claim that "on average, only one out of every three businesses that have the on-site analysis will be invited into the process;"

vi.   The due diligence investigation that PBS would conduct prior to the Business Analyst's meeting with the Seller Client;

vii.  PBS's claim that it would only be paid after the "successful conclusion" of the "buy/sell" transaction or after a "qualified buyer" for the Seller Client was located;

viii. PBS's claim that it only contacted businesses for which it had "qualified buyers" and that only "qualified buyers are given access to PBS's pool of sellers" and that PBS would "weed out" "curiosity seekers, solicitors and tire kickers;" and

ix.   That the Seller Client would only be given the name of a "qualified buyer," who was ready, willing and able to buy the Seller Client's business.

14

i.      Accepted money from Seller Clients and deposited the money into the PBS

bank account or accounts.

k.      Fraudulently paid money to the owners of PBS.

l.      Made payments to the owners of PBS by means of payments to non-existent

and/or shell companies.

m.      Made false oral representations to Seller Clients.

n.      In or about March of 2005, Defendants, HAGAN, RENNEISEN, J.

PERSAUD, and C. PERSAUD agreed to create, and did create, Global Business

Acquisitions (GBA), which was created to serve as a fax blasting company for PBS

Global, Inc. GBA operated under the direction and control of one or more of the

co-conspirators.

o.      Directed the financial transactions of GBA, as well as directed the daily

operations of GBA and received reports about the daily operations of GBA.

p.      Caused PBS Business Analysts to fax PBS documents containing false and

fraudulent representations to Seller Clients of PBS.

q.      Accepted fraudulently obtained money from the Seller Clients of PBS via

credit card and/or check.

r.      Paid the operating expenses of PBS from the funds paid by Seller Clients for

the purchase of independent third party valuations, and

s.      Paid to themselves, or their sham/shell corporations in excess of

$5,800,000.00, contrary to the written and oral representations made to PBS Seller

Clients.

15

The foregoing is in violation of Title 18, United States Code, Section 371 and 1343.

## INTRODUCTION TO MAIL AND WIRE FRAUD COUNTS

### CHAMBERLAIN'S OLDE STUFF,
Shawnee, Kansas

41.    In or about September of 2003, Chamberlain's Olde Stuff, which was owned by

Lonnie and Judy Chamberlain, received an unsolicited fax transmission advising Chamberlain's

Olde Stuff (Chamberlain's) that Prudential Business Services (PBS) had buyers interested in

purchasing Chamberlain's and offering a free valuation of the business.

42.    Lonnie Chamberlain responded to the fax transmission and was subsequently

contacted, via telephone, and an appointment was scheduled for a PBS Business Analyst to meet

with Mr. Chamberlain.

43.    After the appointment was scheduled with the PBS Business Analyst,

Chamberlain's received, via mail, numerous documents from PBS, including the pre-application

documents, making false and fraudulent representations and promises.

44.    On or about October 2, 2003, Lonnie Chamberlain, met with Defendant

RENNEISEN, who was acting as a PBS Business Analyst.

45.    During this meeting, Defendant RENNEISEN made numerous false and fraudulent

representations and promises, to include but not be limited to the following:

      a.    PBS had been in business for ten years, and

      b.    References were provided for persons/businesses which had been sold by

      PBS; the names and telephone numbers of the references were: Andy Lee, (xxx)

16

xxx-6661; Randall Hicks, (xxx) xxx-1934; Anthony Smoker, (xxx) xxx-3731 and
John Kashmire, (xxx) xxx-9912,

46.     The contract entered into between Chamberlain's Olde Stuff and PBS provided that:

a.      PBS was to "hire and pay for an independent Third Party Valuation", the
cost of which was $3,495.00, and Chamberlain's was to pay $1,000.00 to PBS for
the "services set forth" in the agreement and $9,000.00 for successful Business
Matching Services, which was due "two (2) days after Owner sells or transfers" the
business,

b.      Chamberlain agreed to pay for the valuation service and for the services of
PBS by credit card, however, PBS agreed to hold the presentation of the credit card
for payment "pending reference checks given 10-2-03,"

c.      Chamberlain's was to receive a 100% refund of all money paid to PBS if
Chamberlain's had not been "introduced to at least one qualified buyer ... within one
year of the signing of this agreement," and

d.      PBS was to hold submitting Chamberlain's credit card for payment,
"pending reference checks" which Defendant RENNEISEN had provided to
Chamberlain's on 10-2-03.

47.     Lonnie Chamberlain successfully telephoned two of the references, Andy Lee and
Randall Hicks, provided by Defendant RENNEISEN and each reference informed Mr.
Chamberlain that PBS had sold the reference's business and that the reference was satisfied with
the services of PBS.

17

48.     After speaking with Randal Hicks and Andy Lee, Lonnie Chamberlain telephoned PBS and approved submission of his credit card for payment.

49.     In actuality Andy Lee was Defendant WANG and Randall Hicks was Defendant HICKS.

## MIKE'S PLUMBING
Wilson, Kansas

50.     In March of 2004, Mike's Plumbing received the unsolicited fax solicitation referred to in paragraphs 6 and 7. After responding to the fax, a meeting was scheduled between the owner of Mike's Plumbing, Larry Ptacek, and a PBS Analyst, Stuart L.

51.     On or about March 23, 2004, Stuart L. faxed the above described pre-application documents to Mike's Plumbing.

52.     As a result of the written representations contained in the PBS documents and the oral representations made by Stuart L., Mike's Plumbing entered into a contract with PBS.

53.     This contract provided that:

   a.     The sum of $00.00 was to be paid to PBS for its role as intermediary, marketing and the other business services of PBS, $7,495.00 was to be paid for the hiring of an independent firm to perform a valuation of Mike's Plumbing, and $60,500.00 was to be paid to PBS in the event of a successful sale; and

   b.     100% of the money paid to PBS would be refunded to Mike's Plumbing if a qualified buyer had not been introduced to Mike's Plumbing within one year of the contract's date.

18

54.    On or about January 11, 2005, PBS sent, via the United States Postal Service, a letter which represented that Mike's Plumbing had been matched with a qualified buyer, Paul Churchill of Reno, Nevada.

55.    The January 11, 2005, correspondence from PBS further advised Mike's Plumbing that "One of our representatives will contact you when it becomes necessary for you to speak to the potential buyer." Mike's Plumbing received no additional information or other "contact" regarding this "potential buyer."

56.    Mr. Churchill never informed PBS that he was interested in Mike's Plumbing in Wilson, Kansas, rather, Mr. Churchill advised PBS that he was interested in transportation and construction companies located in the Southeastern and Southwestern sections of the United States. Therefore, Mr. Churchill was not a qualified buyer, as defined in the PBS contract and documents.

57.    On or about April 20, 2005, Mike's Plumbing sent, via the United States Postal Service, a letter demanding a refund of the money paid to PBS.

58.    On or about May 16, 2005, PBS sent, via the United States Postal Service, a letter denying Mike's Plumbing's request for a refund, stating that PBS had matched Mike's Plumbing with a qualified buyer, Paul Churchill.

### PRUITT APPLIANCE SERVICE
Topeka, Kansas

59.    In or about July of 2004, Pruitt Appliance Service received the unsolicited fax referred to in paragraphs 6 and 7. After responding to the fax, a meeting was scheduled between the owner of Pruitt Appliance Service, Michael Kierman and Brian H., the PBS Analyst.

60.    After the meeting was scheduled Brian H. faxed the above described pre-application PBS documents to Pruitt Appliance.

61.    As a result of the written representations contained in the PBS documents and the oral representations made by Brian H., Mike Kierman, d/b/a Pruitt Appliance Service entered into a contract with PBS.

62.    This contract provided that:

    a.    The sum of "$0" was to be paid to PBS for its role as intermediary, marketing and the other business services of PBS, $4,495.00 was to be paid for the hiring of an independent firm to perform a valuation of Pruitt Appliance, and $15,000.00 was to be paid to PBS in the event of a successful sale; and

    b.    100% of the money paid to PBS would be refunded to Pruitt Appliance if a qualified buyer had not been introduced to Pruitt Appliance within one year of the contract's date.

63.    On or about August 3, 2005, PBS sent, via the United States Postal Service, a letter which represented that Pruitt Appliance had been matched with a qualified buyer, Joseph Goldstein.

64.    Mr. Goldstein did not inform PBS that he was interested in purchasing Pruitt Appliance in Topeka, Kansas, rather he informed PBS that he was only interested in businesses in the Omaha, Nebraska area. Therefore, Mr. Goldstein was not a qualified buyer, as defined in the PBS contract and documents.

20

65.     On or about August 3, 2005, PBS sent, via the United States Postal Service, a letter denying Pruitt Appliance's request for a refund, stating that PBS had matched Pruitt Appliance with a qualified buyer, Joseph Goldstein.

### SOUTHSIDE PLUMBING TOO, INC.
Overland Park, Kansas

66.     In or about July of 2004, Southside Plumbing Too, Inc., received the unsolicited fax referred to in paragraphs 6 and 7. After responding to the fax, a meeting was scheduled between the owner of Southside Plumbing Too, Inc., Thomas Sheeley, and Brian H., the PBS Analyst.

67.     After the meeting was scheduled Brian H. faxed the pre-application PBS documents to Southside Plumbing.

68.     On or about August 18, 2004, as a result of the written representations contained in the PBS documents and the oral representations made by Brian H., Southside Plumbing entered into a contract with PBS.

69.     This contract provided that:

    a.     The sum of "$0" was to be paid to PBS for its role as intermediary, marketing and the other business services of PBS, $6,995.00 was to be paid for the hiring of an independent firm to perform a valuation of Southside Plumbing, and $45,000.00 was to be paid to PBS in the event of a successful sale; and

    b.     100% of the money paid to PBS would be refunded to Southside Plumbing if a qualified buyer had not been introduced to Southside Plumbing within one year of the contract's date.

21

70.     On or about August 3, 2005, PBS sent, via the United States Postal Service, a letter which represented that Southside Plumbing had been matched with a qualified buyer, Joseph Goldstein.

71.     Mr. Goldstein did not inform PBS that he was interested in Southside Plumbing located in Overland Park, Kansas.  Mr. Goldstein informed PBS that he was only interested in businesses in the Omaha, Nebraska area.  Therefore, Mr. Goldstein was not a qualified buyer, as defined in the PBS contract and documents.

72.     On or about September 28, 2005, Thomas Sheeley, on behalf of Southside Plumbing demanded a refund of the money paid to PBS.

73.     On or about October 26, 2005, PBS sent, via the United States Postal Service, a letter denying Southside Plumbing's request for a refund, stating that PBS had matched Southside Plumbing with a qualified buyer, Joseph Goldstein.

74.     After a second demand for refund was sent by Southside Plumbing, PBS corresponded again with Southside Plumbing, via the United States Postal Service, and on or about November 10, 2005, PBS mailed a letter to Southside Plumbing and claimed that it had eliminated prospective buyers who were only "tire kickers" in reaching its decision to forward Mr. Goldstein's name as a qualified buyer.

75.     On or about March 20,2006, PBS corresponded with Southside Plumbing, via the United States Postal Service,  and falsely represented to Southside Plumbing that Mr. Goldstein had "specifically e-mailed PBS looking at your business."

22

### C & E DOORS, INC.
Great Bend, Kansas

76.    In or about July of 2004, C & E Doors, Inc., received the unsolicited fax referred to

in paragraphs 6 and 7. After responding to the fax, a meeting was scheduled between the owner of

C & E Doors, Eddie Jurgenson, and Brian H., the PBS Analyst.

77.    After the meeting was scheduled Brian H. faxed the pre-application PBS documents

to C & E Doors.

78.    As a result of the written representations contained in the PBS documents and the

oral representations made by Brian H., Eddie Jurgensen entered into a contract with PBS.

79.    This contract provided that:

a.    The sum of "$0" was to be paid to PBS for its role as intermediary,

marketing and the other business services of PBS, $4,995.00 was to be paid for the

hiring of an independent firm to perform a valuation of C & E Doors, and

$18,000.00 was to be paid to PBS in the event of a successful sale, and

b.    100% of the money paid to PBS would be refunded to C&E Doors if a

qualified buyer had not been introduced to C & E Doors within one year of the

contract's date.

80.    On or about August 3, 2005, PBS sent, via the United States Postal Service, a letter

which represented that C & E Doors had been matched with a qualified buyer, Joseph Goldstein,

81.    Mr. Goldstein did not inform PBS that he was interested in purchasing C & E

Doors, of Great Bend, Kansas. Mr. Goldstein informed PBS that he was only interested in

23

businesses in the Omaha, Nebraska area. Therefore, Mr. Goldstein was not a qualified buyer, as defined in the PBS contract and documents.

82.     On or about August 16, 2005, Eddie Jurgenson, telephoned PBS and made an oral demand for a refund of the money paid by C & E Doors to PBS.

83.     On or about March 22, 2006, Eddie Jurgenson, on behalf of C & E Doors, sent a written demand for a refund of the money paid to PBS.

84.     On or about May 10, 2006, PBS sent, via the United States Postal Service, a letter denying C & E Door's Plumbing's request for a refund, stating that PBS had matched C & E Doors with a qualified buyer, Joseph Goldstein and because more than 10 days had elapsed since the expiration of the one year anniversary.

ECONOMY MOVERS
Wichita, Kansas

85.     On or about November 2, 2004, Economy Movers, Inc., received the unsolicited fax referred to above. After responding to the fax, a meeting was scheduled between the owner of Economy Movers, James N. Johnson, and Brian H., the PBS Analyst.

86.     On or about February 1, 2005, Brian H. faxed the pre-application PBS documents to Economy Movers .

87.     On or about February 2, 2005, as a result of the written representations contained in the PBS documents and the oral representations made by Brian H., Economy Movers  entered into a contract with PBS.

88.     This contract provided that:

a.    The sum of "$0" was to be paid to PBS for its role as intermediary,

marketing and the other business services of PBS, $3,995.00 was to be paid for the

hiring of an independent firm to perform a valuation of Economy Movers, and

$12,000.00 was to be paid to PBS in the event of a successful sale; and

b.    100% of the money paid to PBS would be refunded to Economy Movers if a

qualified buyer had not been introduced to Economy within one year of the

contract's date.

89.    On or about December 29, 2005, PBS sent, via the United States Postal Service, a

letter which represented that Economy Movers had been matched with a qualified buyer, Sunil

Chandwani, of Evert, Louisiana.

90.    Ms. Chandwani did not inform PBS that she was interested in Economy Movers of

Wichita, Kansas. Ms. Chandwani informed PBS that she was interested in "ice cream/other food"

and "fast food" businesses. Further she expressed no interest in a business located in the State of

Kansas. Therefore, she was not a qualified buyer as defined by the PBS contract and documents.

91.    On or about February 5, 2006, Economy Movers, mailed to PBS, via the United

States Postal Service, a demand for refund.

92.    On or about February 13, 2006, PBS sent, via the United States Postal Service, a

letter denying a refund to Economy Movers stating that PBS had matched Economy Movers with a

qualified buyer, Sunil Chandwani.

IMC KANSAS
Seneca, Kansas

93.     In February or March of 2005, Industrial Millwork Corporation, hereinafter referred to as IMC, received the unsolicited fax referred to above. After responding to the fax, a meeting was scheduled between the owner of IMC, Kenneth Hermesch, and Brian H., the PBS Analyst.

94.     After the meeting was scheduled Brian H., on or about March 11, 2005, faxed the pre-application PBS documents to IMC .

95.     As a result of the written representations contained in the PBS documents and the oral representations made by Brian H., IMC entered into a contract with PBS.

96.     This contract provided that:

a.      The sum of "$0" was to be paid to PBS for its role as intermediary, marketing and the other business services of PBS, $13,495.00 was to be paid for the hiring of an independent firm to perform a valuation of IMC, and $160,000.00 was to be paid to PBS in the event of a successful sale; and

b.      100% of the money paid to PBS would be refunded to IMC if a qualified buyer had not been introduced to IMC within one year of the contract's date.

97.     On or about April 7, 2005, PBS sent, via the United States Postal Service, a letter which represented that IMC had been matched with a qualified buyer, Warren Caudle of Lafayette, Louisiana.

98.     The April 7, 2005, correspondence from PBS further advised IMC that "One of our representatives will contact you when it becomes necessary for you to speak to the potential

26

buyer." IMC received no additional information or other "contact" regarding this "potential buyer."

99.     Mr. Caudle, however, had informed PBS that he was interested in a "Trucking company" located in Texas, Louisiana, Arkansas or Oklahoma. Mr. Caudle did not express any interest in a business located in the State of Kansas.

100.    Further, Mr. Caudle had informed PBS that he was a broker for Sunbelt Business Services, rather than an actual buyer.

101.    On or about March 16, 2006, IMC mailed to PBS, via the United States Postal Service, a demand for refund.

102.    On or about April 3, 2006, PBS sent, via the United States Postal Service, a letter denying a refund to IMC  stating that PBS had matched IMC with a qualified buyer, Warren Caudle.

## ENGINE HOUSE HOBBIES
Wichita, Kansas

103.    On or about June 20, 2005, the United States Secret Service Office in Wichita, Kansas received an unsolicited fax transmission representing that PBS Global, Inc., had buyers interested in purchasing the office.

104.    After receipt of the unsolicited fax, the owner or Engine House Hobbies was contacted by the United States Secret Service and members of the Wichita Police Department to determine if the owner of Engine House Hobbies would cooperate in an undercover investigation into the activities of PBS.

105.    The owner of Engine House Hobbies agreed to assist in the investigation.

27

106.    Subsequently, Engine House Hobbies responded to the unsolicited fax as if Engine House Hobbies had received the fax.  Engine House Hobbies was contacted, via telephone, by a Appointment Setter for PBS Global and a meeting was scheduled with Defendant COOK, a Senior Business Analyst for PBS Global.

107.    On September 18, 2005, Defendant COOK, representing PBS Global met with John L., owner of Engine House Hobbies, and a Special Agent of the United States Secret Service, acting in an undercover capacity.

108.    During this meeting Defendant COOK, made numerous false and fraudulent representations and promises, including but not limited to the following:

a.      PBS Global contacts potential selling companies after it has been contacted by buyers looking to purchase a business;

b.      Only 30 to 40 per cent of the potential selling businesses contacted by PBS Global are accepted by PBS Global;

c.      He claimed to have been performing business appraisals for two and a half years and to have evaluated 1,000 businesses;

d.      PBS Global guarantees to bring a qualified buyer to the seller;

e.      A buyer is qualified by PBS Global after PBS Global has examined the buyer's bank accounts, credit history and PBS has verified that the buyer can obtain the necessary financing;

f.      COOK claimed that PBS had sold twelve businesses the previous month;

g.      PBS Global uses a "Valuation Board" which meets every Monday at which an "analyst specializing in our industry," an analyst representing the Selling

28

Company and a "representative" for the buyer are present. If there were no buyers or if PBS Global did not feel it could guarantee a buyer, then Engine House Hobbies would not be approved as a seller by PBS Global;

h.    COOK represented that Engine House Hobbies could be sold for approximately $900,000.00 to $1,050,000.00 and that PBS Global would guarantee a buyer for $850,000, if Engine House Hobbies would purchase a third party valuation of the business, the price of which was $8,200.00;

i.    That the third party valuation company had no connection with PBS Global;

j.    If PBS Global did not provide a qualified buyer within one year then Engine House Hobbies would receive a full refund; and

k.    COOK further represented that he had not had any complaints from any of his customers but that he would call to see if there were other complaints.

109.    On or about September 27, 2005, Defendant COOK telephoned John L. and represented that PBS Global had a "new way" to recapitalize income and would be able to justify a selling price of $1,500,000.00 for Engine House Hobbies.

All of the above being in violation of Title 18, United States Code, Sections 371 and 1343.

**COUNTS TWO THROUGH FIFTEEN**
**WIRE FRAUD - FAXED TRANSMISSIONS**

110.    The Grand Jury repleads and realleges paragraphs 1 through 109.

111.    Beginning on a date unknown to the Grand Jury but continuing through September 25, 2006, in the District of Kansas and elsewhere, the Defendants:

### RICHARD A. HAGAN, BRIAN P. RENNEISEN,
### JOHN R. PERSAUD, CHERI L. PERSAUD,
### and ANDREW S. WANG,

having devised, or intending to devise, a scheme or artifice to defraud, or for obtaining money by

means of false or fraudulent pretenses, representations, or promises, did transmit or cause to be

transmitted, by means of wire or radio communication in interstate commerce, writings, signs,

signals, pictures or sounds for the purpose of executing the scheme or artifice, to wit; the

Defendants,

### RICHARD A. HAGAN, BRIAN P. RENNEISEN,
### JOHN R. PERSAUD, CHERI L. PERSAUD,
### and ANDREW S. WANG,

transmitted, or caused to be transmitted, fax transmissions from locations outside the State of

Kansas to locations within the State of Kansas, as follows:

| Count | Date | Transmission | Recipient |
|-------|------|--------------|-----------|
| 2 | October 2003 | Faxed Solicitation | Chamberlain's Olde Stuff Shawnee, KS |
| 3 | October 2003 | Faxed PBS Documents | Chamberlain's Olde Stuff Shawnee, KS |
| 4 | March or April 2004 | Faxed Solicitation | Mike's Plumbing Wilson, KS |
| 5 | April xx, 2004 | Faxed PBS Documents | Mike's Plumbing Wilson, KS |
| 6 | July or August 2004 | Faxed Solicitation | Pruitt Appliance Service Topeka, KS |
| 7 | August 2004 | Faxed PBS Documents | Pruitt Appliance Service Topeka, KS |

| 8 | July or August 2004 | Faxed Solicitation | Southside Plumbing Too, Inc. Overland Park, KS |
| 9 | August 2004 | Faxed PBS Documents | Southside Plumbing Too, Inc. Overland Park, KS. |
| 10 | July or August 2004 | Faxed Solicitation | C & E Doors Great Bend, KS |
| 11 | August 2004 | Faxed PBS Documents | C & E Doors Great Bend, KS |
| 12 | November 2, 2004 | Faxed Solicitation | Economy Movers Wichita, KS |
| 13 | February 1, 2005 | Faxed PBS Documents | Economy Movers Wichita, KS |
| 14 | February or March 2005 | Faxed Solicitation | Industrial Millwork Corp. |
| 15 | March 11, 2005 | Faxed PBS Documents | Industrial Millwork Corp. |

All of the above being violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS SIXTEEN THROUGH TWENTY
## WIRE FRAUD - TELEPHONE CALLS

112.    The Grand Jury repleads and realleges paragraphs 1 through 109.

113.    Beginning on a date unknown to the Grand Jury but continuing through October of

2003, in the District of Kansas and elsewhere, the Defendants:

**RICHARD A. HAGAN, BRIAN P. RENNEISEN,
JOHN R. PERSAUD, ANDREW S. WANG,
SHAUN A. SMOKER, and MARVIN HICKS,**

having devised, or intending to devise, a scheme or artifice to defraud, or for obtaining money by

means of false or fraudulent pretenses, representations, or promises, did transmit or cause to be

transmitted, by means of wire or radio communication in interstate commerce, writings, signs,

signals, pictures or sounds for the purpose of executing the scheme or artifice, to wit; the

Defendants

**RICHARD A. HAGAN, BRIAN P. RENNEISEN,**
**JOHN R. PERSAUD, ANDREW S. WANG,**
**SHAUN A. SMOKER, and MARVIN HICKS,**

transmitted, or caused to be transmitted, interstate telephone calls, between locations within the

State of Kansas and locations outside the State of Kansas, as follows:

| Count | Date | Caller | Phone Number Called/Person/Entity |
|-------|------|--------|-----------------------------------|
| 16 | 8- -05 | PBS Appointment Setter | Engine House Hobbies Wichita, KS |
| 17 | 10- -03 | Lonnie Chamberlain | 732 895 6661 (Wang) |
| 18 | 10- -03 | Lonnie Chamberlain | 678 540 1934 (Hicks) |
| 19 | 10- -03 | Lonnie Chamberlain | 262 780 3731 (Smoker) |
| 20 | 10- -03 | Lonnie Chamberlain | 502 417 9912 (J. Persaud) |

All of the above being in violation of Title 18, United States Code, Sections 1343 and 2.

**COUNT TWENTY-ONE**
**WIRE FRAUD - TELEPHONE CALL**

114.    The Grand Jury repleads and realleges paragraphs 103 through 109.

115.    On or about September 27, 2005, in the District of Kansas and elsewhere, the

Defendant:

**BRANDON COOK,**

having devised, or intending to devise, a scheme or artifice to defraud, or for obtaining money by

means of false or fraudulent pretenses, representations, or promises, did transmit or cause to be

transmitted, by means of wire or radio communication in interstate commerce, writings, signs,

signals, pictures or sounds for the purpose of executing the scheme or artifice, to wit; the

Defendant

### BRANDON COOK,

transmitted, or caused to be transmitted, interstate telephone calls, to a location within the State of

Kansas and from a location outside the State of Kansas, and made false and fraudulent

representations to the owner of Engine House Hobbies.

All of the above being in violation of Title 18, United States Code, Section 1343.

### COUNTS TWENTY-TWO THROUGH THIRTY-FOUR
### MAIL FRAUD

116.    The Grand Jury repleads and realleges paragraphs 1 through 109.

117.    Beginning on a date unknown to the Grand Jury but continuing through September

25, 2006, in the District of Kansas and elsewhere the Defendants,

### RICHARD A. HAGAN, BRIAN P. RENNEISEN,
### JOHN R. PERSAUD, and CHERI L. PERSAUD,

having devised or intending to devise a scheme or artifice to defraud, for the purpose of obtaining

money by means of false or fraudulent pretenses, representations or promises, did for the purpose

of executing such scheme or artifice, did cause to be deposited a matter or thing to be sent or

delivered by mail according to the direction thereon, or at the place at which it is directed to be

delivered by the person to whom it is addressed, to wit;

the Defendants:

33

**RICHARD A. HAGAN, BRIAN P. RENNEISEN,**
**JOHN R. PERSAUD, and CHERI L. PERSAUD,**

for the purpose of executing a scheme or artifice to defraud, did place, or caused to be placed, in the mail, letters and documents, which were to be delivered by the United States Postal Service, to the person and address set forth on the envelope in which the letters and documents were placed for mailing.

| Count | Date | Recipient | Documents |
|-------|------|-----------|-----------|
| 22 | October 2003 | Chamberlain's Olde Stuff | PBS Documents |
| 23 | January 11, 2005 | Mike's Plumbing | Match Letter |
| 24 | May 16, 2005 | Mike's Plumbing | Denial Letter |
| 25 | August 3, 2005 | Pruitt Appliance | Match Letter |
| 26 | August 3, 2005 | Southside Plumbing | Match Letter |
| 27 | October 26, 2005 | Southside Plumbing | Denial Letter |
| 28 | March 20, 2006 | Southside Plumbing | Denial Letter |
| 29 | August 3, 2005 | C & E Doors | Match Letter |
| 30 | May 10, 2006 | C & E Doors | Denial Letter |

| 31 | December 29, 2005 | Economy Movers | Match Letter |
| 32 | February 13, 2006 | Economy Movers | Denial Letter |
| 33 | April 7, 2005 | IMC | Match Letter |
| 34 | April 3, 2006 | IMC | Denial Letter |

All of the above being in violation of Title 18, United States Code, Sections 1341 and 2.

### COUNT THIRTY-FIVE
### MONEY LAUNDERING CONSPIRACY - PROMOTION

118.    The Grand Jury repleads and realleges paragraphs 1 through 115.

119.    Beginning on a date unknown to the Grand Jury and continuing through June of

2004, the exact dates being unknown to the Grand Jury, in the District of Kansas and elsewhere,

the Defendants,

### RICHARD A. HAGAN, BRIAN P. RENNEISEN,
### JOHN R. PERSAUD, CHERI L. PERSAUD, ANDREW S. WANG,
### SHAUN A. SMOKER, and MARVIN HICKS,

knowingly and willfully combined, conspired, confederated and agreed with each other and with

other persons, both known and unknown to the Grand Jury :

a.    To commit an offense and offenses in violation of Title 18, United States

Code, §1956, and

b.    Did an act or acts to effect the object of the conspiracy, to include those acts

set forth in paragraphs 1 through 116, including but not limited to the following

additional acts;

35

i.  Payment to PBS was made by the Seller Client upon the signing of the contract and was made via check or credit card. The business analyst would then mail to the check to PBS, or transmit the credit card information to PBS. PBS would then negotiate the check and deposit the proceeds into a PBS bank account. If payment was by credit card, PBS caused the Seller Client's credit card to be debited and the funds were then deposited into the PBS bank account;

ii.  Money deposited into the PBS bank account would then be used, and was used, to promote the specified unlawful activities of PBS, to include but not limited to the following;

iii.  Payment of faxing expenses;

iv.  Payment of the printing expenses for the aforedescribed PBS documents;

v.  Payment of the salaries of the PBS Appointment Setters;

vi.  Payment of the sales commission to the PBS Business Analysts;

vii.  Payment of the salaries and expenses of Richard A. Hagan, Brian P. Renneisen and John R. Persaud;

viii.  Payments to Cheri L. Persaud;

ix.  Payments to sham corporations under the control of Richard A. Hagan, Brian P. Renneisen, John R. Persaud and Cheri L. Persaud, Andrew S. Wang, Marvin R. Hicks;

x.  Payment of the salaries of other PBS employees;

          xi.      Payment of the PBS telephone bills;

          xii.     Payments to various valuation companies; and

          xiii.    Payments of any other PBS expenses.

120.    On or about July 1, 2004, Defendants, Wang, Smoker and Hicks quit working for

PBS and formed another business  which operated in a substantially similar manner as PBS,

however, beginning on or about July 1, 2004 and continuing through September 2006, the

defendants,

**RICHARD A. HAGAN, BRIAN P. RENNEISEN,**
**JOHN R. PERSAUD, and CHERI L. PERSAUD,**

knowingly and willfully continued to combine, conspire, confederate and agree with  each other

and with other persons, both known and unknown to the Grand Jury :

        a.      To commit an offense and offenses in violation of Title 18, United States

Code, §1956, and

        b.      Did an act or acts to effect the object of the conspiracy, to include those acts

set forth in paragraphs 1 through 116,including but not limited to the following

additional acts:

          i.      Payment to PBS was made by the Seller Client upon the signing of

the contract and was made via check or credit card.  The business

analyst would then mail to the check to PBS, or transmit the credit

card information to PBS.  PBS would then negotiate the check and

deposit the proceeds into a PBS bank account.  If payment was by

credit card, PBS caused the Seller Client's credit card to be debited and the funds were then deposited into the PBS bank account;

ii.     Money deposited into the PBS bank account would then be used, and was used, to promote the specified unlawful activities of PBS, to include but not limited to the following;

iii.    Payment of faxing expenses;

iv.     Payment of the printing expenses for the aforedescribed PBS documents;

v.      Payment of the salaries of the PBS Appointment Setters;

vi.     Payment of the sales commission to the PBS Business Analysts;

vii.    Payment of the salaries and expenses of Richard A. Hagan, Brian P. Renneisen and John R. Persaud;

viii.   Payments to Cheri L. Persaud;

ix.     Payments to sham corporations under the control of Richard A. Hagan, Brian P. Renneisen, John R. Persaud and Cheri L. Persaud, Andrew S. Wang, Marvin R. Hicks;

x.      Payment of the salaries of other PBS employees;

xi.     Payment of the PBS telephone bills;

xii.    Payments to various valuation companies;

xiii.   Payments of any other PBS expenses.

All of the above being in violation of Title 18, United States Code, Section 1956(h).

## COUNTS THIRTY-SIX THROUGH FORTY-THREE
## MONEY LAUNDERING - PROMOTION

121.    The Grand Jury repleads and realleges paragraphs 1 through 120.

122.    On or about the dates set forth below, in the District of Kansas, and elsewhere,

Defendants,

### RICHARD HAGAN, BRIAN P. RENNEISEN, JOHN R. PERSAUD,
### and CHERI L. PERSAUD,

did knowingly and willfully conduct and attempt to conduct a financial transaction affecting

interstate commerce, to wit, accepted a check or credit card transaction, which involved the

proceeds of a specified unlawful activity, that is mail fraud and/or wire fraud, with the intent to

promote the carrying on of specified unlawful activity, to wit: to accept, or cause to be accepted,

money from a victim of the Defendants' scheme to defraud in the form of a check or credit card

payment and to then use the funds generated by said scheme or artifice to promote the unlawful

activities of PBS, and that while conducting and attempting to conduct such financial transaction

knew that the property involved in the financial transaction, that is the monetary instruments,

checks or credit card transaction, reflected below represented the proceeds of some form of

unlawful activity.

| Count | Date | Amount | Payee |
|-------|------|--------|-------|
| 36 | 10-8-03 | $2,250.00 | Chamberlains' Old Stuff |
| 37 | 11-6-03 | $2,250.00 | Chamberlains' Old Stuff |
| 38 | 4-14-04 | $7,495.00 | Mike's Plumbing |
| 39 | 8-18-04 | $4,495.00 | Pruitt Appliance Service |
| 40 | 8-18-04 | $6,995.00 | Southside Plumbing Too, Inc. |

| 41 | 8-19-04 | $4,995.00 | C & E Doors |
| 42 | 2-2-05 | $3,995.00 | Economy Movers |
| 43 | 3-16-05 | $13,495.00 | Industrial Millwork Corp. |

The foregoing was in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 2.

### COUNT FORTY-FOUR
### MONEY LAUNDERING CONSPIRACY - CONCEALMENT

123.    The Grand Jury repleads and realleges paragraphs 1 through 23, 28 through 109, 111, 113, and 117.

124.    On or about October 14, 1997, John R. Persaud, the defendant herein, was convicted, in the United States District Court for the Western District of Kentucky, Case Number 97 CR 00049-01-H, of violating Title 18, United States Code, §§143 and 2, Wire Fraud, and Title 18, United States Code, §1957, Money Laundering.

125.    As a result of the above conviction John R. Persaud was sentenced to 27 months imprisonment, was ordered to pay restitution in the amount of $1,713,923.00, and given a three year period of supervision.

126.    After John R. Persaud was released from prison, the United States Attorney's Office for the Western District of Kentucky began efforts to collect the restitution judgment of $1,713,923.00.

127.    In its efforts to collect restitution the United States Attorney for the Western District of Kentucky, required John R. Persaud to complete and file various financial statements which

40

required John R. Persaud to identify his income and assets from which the restitution judgment could be satisfied.

      a.     On or about October 23,2000, John R. Persaud, signed and submitted a Financial Statement to the United States Attorney for the Western District of Kentucky.  In this Financial Statement John R. Persaud represented that:

-    he was a business consultant employed by Glenmary LLC., earning $2,800.00 per month;

-    his wife, Cheri L. Persaud, was not employed;

-    neither he nor his wife owned a checking account at the time the Financial Statement was submitted, although John R. Persaud did own a savings account at PNC bank, which had a balance of $25.00;

-    neither he nor his spouse owned any real estate and were renting the residence in which they lived; and

-    neither he nor his wife owned any stocks, bonds or other securities, nor did they have any interest in any pension plan, retirement fund or profit sharing plan.

      b.     In January of 2002, John R. Persaud signed and submitted a Financial Statement to the United States Attorney for the Western District of Kentucky.  In this Financial Statement John R. Persaud represented that:

-    he was a business consultant employed by Glenmary LLC., earning $2,800.00 per month;

-    his spouse, Cheri L. Persaud, was not employed;

- neither he nor his spouse had held a checking account in the preceding two years but they owned a savings account at PNC Bank, which had an account balance of $50.00 and that John R. Persaud was the only name on the account;

- that neither he nor his spouse owned or were purchasing any real estate but were renting the premises in which they lived; and

- neither he nor his wife owned any stocks, bonds or other securities, nor did they have any interest in any pension plan, retirement fund or profit sharing plan.

128.    On or about April 22, 2005, John R. Persaud, through his attorney, informed the United States Attorney for the Western District of Kentucky that John R. Persaud was employed with "Prudential Business Services" (PBS) and "received an annual salary of $32,000.00" and that his wife was a "member of the Board of Directors and the VP of Sales for PBS."

129.    On or about September 25, 2007, John R. Persaud, through his attorney, informed the United States Attorney for the Western District of Kentucky that "Cheri L. Persaud does not intermingle any assets or funds with her husband," had filed separate tax returns for the preceding five years, and had refused to disclose any of her assets to the United States.

130.    In or about July of 2003, Prudential Business Services (PBS) was formed and Cheri L. Persaud was identified as a one-third owner of PBS and John R. Persaud was identified as an employee. Subsequently, Prudential Business Services changed its name to PBS, Global, Inc.

131.    Cheri L. Persuad never worked for, nor provided any service to, either Prudential Business Services or PBS Global, Inc.

42

132.    From on or about July 1, 2003, through December 31, 2003, PBS paid John R. Persaud approximately $30,000.00 in commissions.

133.    Despite Cheri L. Persaud's failure to provide any services to PBS in 2003, PBS paid $337,104.34 in commissions to two companies owned by Cheri L. Persaud, UKP, LLC., and Glen Mary, LLC.

134.    In 2003, PBS did not pay any money, in the form of dividends, either directly or indirectly to Cheri L. Persaud.

135.    In 2004, PBS paid John R. Persaud $30,000.00 in commissions and $15,695.22 in salary.

136.    Despite Cheri L. Persaud's failure to provide any services to PBS in 2004; PBS paid:

- UKP, LLC., $1,399,119.20 in commissions;

- Glen Mary, LLC., $47,057.85 in commissions;

- and another company owned by Cheri L. Persaud, Fort Lauderdale Corp.,
  $69,568.74 in commissions.

137.    Additionally, PBS paid UKP, LLC., and Glen Mary, LLC., $313,636.99 for "lead generation."

138.    In 2005, PBS paid John R. Persaud $40, 000.00 in commissions.

139.    Despite Cheri L. Persuad's failure to provide any services to PBS in 2005, PBS paid approximately $976,154.31 in commissions to UKP, LLC., Glen Mary, LLC., and Fort Lauderdale Corp.

140.    In 2005, PBS paid Cheri L. Persaud's companies an as of yet undetermined amount for "lead generation."

141.    Cheri L. Persaud never performed any service for PBS which would have generated commission income during 2003, 2004, or 2005, nor did Cheri L. Persaud engage in any activity which generated "leads" for PBS.

142.    John R. Persaud and Cheri L. Persaud agreed that commission income and lead generation income "earned" by John R. Persaud would be paid to companies owned by Cheri L. Persaud; specifically UKP, LLC., Glen Mary, LLC., Fort Lauderdale Corp., and Tropical JCP.

143.    The commission and lead generation payments were deposited into the bank accounts of UKP, LLC., Glen Mary, LLC., Fort Lauderdale Corp., and Tropical JCP, and were commingled with the assets of Cheri L. Persaud. John R. Persaud and Cheri L. Persaud agreed to use the above described  commission and lead generation payments from PBS for their mutual benefit.

144.    The above described commission and lead generation  payments were then used by John R. Persaud and Cheri L. Persaud to purchase their residence, various condominiums, automobiles, jewelry, and other assets, which were titled in the sole name of Cheri L. Persaud.

145.    The commission payments made by PBS to John R. Persaud and to Cheri L. Persaud's companies exceeded the commission "earned" by John R. Persaud.  The additional sums came from money paid to PBS by other victims who had been solicited by other PBS analysts, including, but not limited to, those identified in Counts 2 through 15.

146.    Beginning in approximately July of 2003 and continuing through at least September of 2006, in the District of Kansas and elsewhere, the defendants,

44

## JOHN R. PERSAUD and CHERI L. PERSAUD,

did willfully, knowingly and unlawfully conspire to commit an offense and offenses in violation of Title 18, United States Code, §1956, and the defendants did an act to effect the object of the conspiracy.

In furtherance of the conspiracy, and to achieve the objects thereof, the defendants committed and caused to be committed overt acts described in paragraphs 123 through 145.

The above being in violation of Title 18, United States Code, §1956(h).

### FORFEITURE ALLEGATION

147.    Upon conviction of the offense alleged in Count One of this Second Superceding Indictment, Defendants, RICHARD A. HAGAN, BRIAN P. RENNEISEN, JOHN R. PERSAUD, CHERI L. PERSAUD, SHAUN A. SMOKER, ANDREW S. WANG, and MARVIN R. HICKS shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461(c) any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violation, including but not limited to the following:

1. MONEY JUDGMENT

A sum of money equal to $18,483,018.73 in United States currency, representing the amount of proceeds obtained as a result of the offense in Count One - Conspiracy to Commit Wire Fraud, Title 18, United States Code, §§ 371 and 1343, for which the defendants are jointly and severally liable.

2. REAL PROPERTY

A.  RICHARD A. HAGAN

45

(1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 910 John Smith Road, Columbus, North Carolina 28722, located in Polk County, North Carolina, recorded in Book 000328, Page 001377.

## B. BRIAN P. RENNEISEN

(1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 204 Glen Riddle Road, Media, Pennsylvania, 19063, more particularly described as: All that certain lot or piece of ground situate in Middletown Township, County of Delaware, Commonwealth of Pennsylvania, described according to a Final Subdivision Plan of Property for Overlook Reserve at Riddle's Farm made by G.D. Houtman and Son, Inc. Civil Engineers - Land Surveyors and Land Planners dated 10/16/2001 last revised 10/21/2002 in Plan Volume 23 page 348 as follows to wit:
Beginning at a point on the Southeasterly side of a 50 feet wide Access and Utility Easement a corner of Lot #1 on said Plan; thence extending from said beginning point and along said Lot crossing the aforesaid Easement North 86 degrees 59 minutes East 249.15 feet to a point in land of now or late of Joseph J. Mariani; thence extending along said land and along lands now or late Joseph T. Riper South 9 degrees 46 minutes East 204.76 feet to a point in lands now or late of Kenneth A. Gumienny and Martha E. Gumienny; thence extending along said lands and along Lot #3 on said Plan the 2 following courses and distances 1) South 85 degrees 55 minutes West 89.88 feet to a point and 2) South 84 degrees 55 minutes 33 seconds West 133.49 feet to a point a corner of Lot #3 on said Plan; thence extending along said Lot the two following courses and distances 1) North 3 degrees 1 minute West 123.08 feet to a point and 2) South 86 degrees 59 minutes West to a point on the Southeasterly side of said Easements; thence extending along said Easements North 3 degrees 1 minute West 86.73 feet to the first mentioned point and place of beginning.
Being Lot #2 on Said Plan, Containing 1 acre.
Being Parcel ID No. 27-00-00736-01.

## C. JOHN R. PERSAUD

(1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 17686 Circle Pond Court, Boca Raton, Florida, 33496, more particularly described as: All that certain land situate in Palm Beach County, State of Florida, viz: Lot 6 of FOX HILL ESTATES OF BOCA RATON, according to the Plat

thereof, recorded in Plat Book 87, Page 4, of the Public Records of Palm Beach County, Florida.

(2) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1458 Ocean Drive PH2, Miami Beach, Florida 33139, more particularly described as: The Condominium Parcel known as Residential Condominium Unit PH 2, of De Soleil South Beach Residential Condominium ("Condominium"), according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 25089, Page 2304 of Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto, and any and all amendments thereto.

(3) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 4400 Highway A1A, Apt 20, Vero Beach, Florida 32963 located in Indian River County, Florida. Parcel Number 32-40-29-00007-0000-00020.0 recorded in Book 001666, Page 000137.

## D. CHERI L. PERSAUD

(1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 17686 Circle Pond Court, Boca Raton, Florida, 33496, more particularly described as: All that certain land situate in Palm Beach County, State of Florida, viz: Lot 6 of FOX HILL ESTATES OF BOCA RATON, according to the Plat thereof, recorded in Plat Book 87, Page 4, of the Public Records of Palm Beach County, Florida.

(2) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1458 Ocean Drive PH2, Miami Beach, Florida 33139, more particularly described as: The Condominium Parcel known as Residential Condominium Unit PH 2, of De Soleil South Beach Residential Condominium ("Condominium"), according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 25089, Page 2304 of Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto, and any and all amendments thereto.

(3) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 4400 Highway A1A, Apt 20, Vero Beach, Florida 32963 located in Indian River

County, Florida. Parcel Number 32-40-29-00007-0000-00020.0 recorded in Book 001666, Page 000137.

### E. ANDREW WANG

(1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 8 Day Lily Drive, Mount Laurel, New Jersey 08054, more particularly described as: All That Certain tract or parcel of land and premises situate and being in the Township of Mount Laurel, County of Burlington and State of New Jersey. Beginning at a point in the Southwesterly line of Daylily Drive (60.00 feet wide) said point being Southeasterly a distance of 362.97 feet measured along the curved and tangent Southwesterly line of Daylily Drive from the Southerly end of a curve connecting same with the Southeasterly line of Elbo Lane, also known as County Route 612 as widened to 33.00 feet from the original center line a said connecting curve having a radius of 45.00 feet, said beginning point being in the division line between Lots 15 and 16, Block 804.03 as shown on the plan hereinafter mentioned and extending; thence 1) South 17 degrees 59 minutes 15 seconds along the Southwesterly line of Daylily Drive, a distance of 132.35 feet to a point; thence 2) South 72 degrees 00 minutes 45 seconds West along the division line between Lots 16 and 17, Block 804.03 of said plan, a distance of 302.02 feet to a point in the line of Lot 2.01, Block 8.02 of said plan; thence 3) North 17 degrees 59 minutes 15 seconds West along the division line between Lot 16, Block 804.03 and Lot 2.01, Block 8.02 of said plan, a distance of 132.35 feet to a point; thence 4) North 72 degrees 00 minutes 45 seconds East along the division line between Lot 15 and 16, Block 804.03 of said plan, a distance of 203.02 feet to the point and place of beginning. Being known as Lot 16, Block 804.03 as shown on Major Subdivision Plan, Laurel Ponds II, Section II, filed in the Office in the Burlington County Clerk on November 20, 1992 as Map No. 05476.

(2) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1458 Ocean Drive PH20, Miami Beach, Florida 33139, more particularly described as: The Condominium Parcel known as Residential Condominium Unit PH 20, of De Soleil South Beach Residential Condominium ("Condominium"), according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 25089, Page 2304 of the Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto, and any and all amendments thereto.

### 3. CONVEYANCES

A. RICHARD A. HAGAN

(1) 2004 Chrysler Pacifica 4 Door Wagon Sport Utility, VIN: 2C8GM68454R631043, Tag Number J20PRC

(2) 2004 Dodge Ram 1500 Quad ST/SLT Crew Pickup, VIN: 1D7HA18D04S692516, Tag Number X66WHV

B. JOHN R. PERSAUD

(1) 2006 Honda Odyssey EX Sport Van, VIN: 5FNRL387X6B035866, Tag Number D432RY

C. CHERI L. PERSAUD

(1) 2004 Lexus GX 470 4 Door Wagon Sport Utility, VIN: JTJBT20X640035878, Tag Number X84GGJ

(2) 2005 Lexus LS 430 Sedan 4 Door, VIN: JTHBN 36F555004092, Tag Number H82ULA

4. PRECIOUS GEMSTONES, PRECIOUS METALS AND JEWELRY

A. JOHN R. and/or CHERI L. PERSAUD

(1) Jasmine de Nuit necklace in 18k yellow gold, (4.08 cts. sapphire) 1.07 cts. (diamonds) purchased on December 15, 2006, from Kaufmann de Suisse, Palm Beach, Florida

(2) Jasmine de Nuit necklace in 18k white gold with 3.62 cts. sapphires, 1.13 cts. of diamonds purchased on December 15, 2006, from Kaufmann de Suisse, Palm Beach, Florida

(3) Fancy light yellow 4.81 cts. set with 0.20 cts. of diamonds, #21280 purchased on May 19, 2004, from Kaufmann de Suisse, Palm Beach, Florida.

5. BANK ACCOUNTS

All United States currency funds or other monetary instruments credited to:

A.  USAA Federal Savings Bank Account #03664570 in the name of Brian & Paula Renneisen

B.  Wells Fargo Bank Account #7045649519 in the name of ABL Global, Inc.

C.  Wells Fargo Bank Account #0374674315 in the name of ABL Global, Inc.

D.  Edward Jones Account #96808241 in the name of ABL Global, Inc.

E.  Edward Jones Account #96806155 in the name of Brian & Paula Renneisen

F.  Edward Jones Account #96892277 in the name of Brian Renneisen

G.  Bank of America Account #003766053709 in the name of Cheri L. Persaud

H.  Bank of America Account #005493998520 in the name of UKP, LLC.

I.  Charles Schwab Account #30704688 in the name of UKP, LLC.

J.  Bank of America Account #005493998274 in the name of Glenmary Corporation

K.  Florida Business Bank Account #10004262 in the name of Classic Muscle Car Superstore

L.  Bank of America Account #003671623169 in the name of PBS Global, Inc.

M.  Charles Schwab Account # 91436123 in the name of Sara Wang

N.  Charles Schwab Account #31638785 in the name of Nancy Clark

O.  Bank of America Account #003938926402 in the name of OIGNA, Inc.

P.  Ameriprise Financial Services Accounts:

- Riversource Life Insurance, Policy Number 5405 6742 021, in the name of PBS Global, Inc.,

- Riversource Life Insurance, Policy Number 9000 0758 6949,  in the name of John Persaud,

- Riversource Life Insurance, Policy Number 9000 0758 7033 in the name of Richard Hagan,

- Riversource Life Insurance, Policy Number 9000 7587 047- in the name of Brian P. Renneisen,

- Riversource Life Insurance , Policy Number 9000 7392 051 5, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number  0909 0732 8654 6 004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 0931 0732 9230 8 004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 0191-4167053-013, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9000-7392051-004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9000 7586 949 6 in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9090 7328654 004, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0909 0734 3357 7 004, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0931 0732 9234 0 004, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0191 4167053 013,  in the name of Cheri L. Persaud,

- Ameriprise Financial Services, Account Number 0000 3376 1016 021, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number, 0400-0451700-040  in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0190-1843658-098,  in the name of Cheri L. Persaud,

- Ameriprise Financial Services, Account Number 3327 9050 0 021, in the name of UKP LLC., and

- Ameriprise Financial Services, Account Number 0490-1762338-098, in the name of UKP LLC.

148. Upon conviction of one or more of the offenses alleged in Counts Two through Fifteen of this Second Superceding Indictment, Defendants, RICHARD A. HAGAN, BRIAN P. RENNEISEN, JOHN R. PERSAUD, CHERI L. PERSAUD, and ANDREW S. WANG, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violations, including but not limited to the real and personal property identified in paragraph 147, above.

149. Upon conviction of one or more of the offenses alleged in Counts Sixteen through Twenty of this Second Superceding Indictment, Defendants, RICHARD A. HAGAN, BRIAN P. RENNEISEN, JOHN R. PERSAUD, SHAUN A. SMOKER, ANDREW S. WANG, and MARVIN R. HICKS shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violations, including but not limited to the real and personal property identified in paragraph 147, above.

150. Upon conviction of one or more of the offenses alleged in Counts Twenty-Two through Thirty-Four of this Second Superceding Indictment, Defendants, RICHARD A. HAGAN, BRIAN P. RENNEISEN, JOHN R. PERSAUD, and CHERI L. PERSAUD shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property constituting or derived from proceeds obtained directly or indirectly as a result of the said

violations, including but not limited to the real and personal property identified in paragraph 147, above.

151.    Pursuant to Title 18, United States Code, Section 982(a)(1), each defendant who is convicted of the offenses set forth in Count Thirty-Five through Forty-Three of the Second Superceding Indictment shall forfeit to the United States the following property:

      a.    All right, title, and interest in any and all property involved in each offense in violation of Title 18, United States Code, Sections 1956, or conspiracy to commit such offense, for which the defendant is convicted, and all property traceable to such property, including the following:

          i)    all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of Section 1956;

          ii)    all commissions, fees and other property constituting proceeds obtained as a result of those violations; and,

          iii)    all property used in any manner or part to commit or to facilitate the commission of those violations.

      b.    A sum of money equal to the total amount of money involved in each offense, or conspiracy to commit such offense, for which the defendant is convicted. If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

      c.    BANK ACCOUNTS

          i)    Bank of America Account #003671623169 in the name of PBS Global, Inc.

ii)    Ameriprise Financial Accounts:

- Riversource Life Insurance, Policy Number 5405 6742 021, in the name of PBS Global, Inc.,

- Riversource Life Insurance, Policy Number 9000 0758 6949, in the name of John Persaud,

- Riversource Life Insurance, Policy Number 9000 0758 7033 in the name of Richard Hagan,

- Riversource Life Insurance, Policy Number 9000 7587 047- in the name of Brian P. Renneisen,

- Riversource Life Insurance , Policy Number 9000 7392 051 5, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number  0909 0732 8654 6 004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 0931 0732 9230 8 004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 0191-4167053- 013, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9000-7392051- 004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9000 7586 949 6 in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9090 7328654 004, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0909 0734 3357 7 004,  in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0931 0732 9234 0 004,  in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0191 4167053 013,  in the name of Cheri L. Persaud,

- Ameriprise Financial Services, Account Number 0000 3376 1016 021, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number, 0400-0451700-040  in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0190-1843658-098,  in the name of Cheri L. Persaud,

- Ameriprise Financial Services, Account Number 3327 9050 0 021, in the name of UKP, LLC., and

- Ameriprise Financial Services, Account Number 0490-1762338-098, in the name of UKP, LLC.,

152.    If any of the above-described forfeitable property, as a result of any act or omission

of the defendants:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be divided without

difficulty; it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as

incorporated by 18 U.S.C. § 982(b), to seek forfeiture of any other property of said

defendant(s) up to the value of the forfeitable property described above, including

but not limited to the following:

1. REAL PROPERTY

A.  RICHARD A. HAGAN

55

1)  All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 910 John Smith Road, Columbus, North Carolina 28722, located in Polk County, North Carolina, recorded in Book 000328, Page 001377.

## B.  BRIAN P. RENNEISEN

1)  All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 204 Glen Riddle Road, Media, Pennsylvania, 19063, more particularly described as:
All that certain lot or piece of ground situate in Middletown Township, County of Delaware, Commonwealth of Pennsylvania, described according to a Final Subdivision Plan of Property for Overlook Reserve at Riddle's Farm made by G.D. Houtman and Son, Inc. Civil Engineers - Land Surveyors and Land Planners dated 10/16/2001 last revised 10/21/2002 in Plan Volume 23 page 348 as follows to wit:
Beginning at a point on the Southeasterly side of a 50 feet wide Access and Utility Easement a corner of Lot #1 on said Plan; thence extending from said beginning point and along said Lot crossing the aforesaid Easement North 86 degrees 59 minutes East 249.15 feet to a point in land of now or late of Joseph J. Mariani; thence extending along said land and along lands now or late Joseph T. Riper South 9 degrees 46 minutes East 204.76 feet to a point in lands now or late of Kenneth A. Gumienny and Martha E. Gumienny; thence extending along said lands and along Lot #3 on said Plan the 2 following courses and distances 1) South 85 degrees 55 minutes West 89.88 feet to a point and 2) South 84 degrees 55 minutes 33 seconds West 133.49 feet to a point a corner of Lot #3 on said Plan; thence extending along said Lot the two following courses and distances 1) North 3 degrees 1 minute West 123.08 feet to a point and 2) South 86 degrees 59 minutes West to a point on the Southeasterly side of said Easements; thence extending along said Easements North 3 degrees 1 minute West 86.73 feet to the first mentioned point and place of beginning.
Being Lot #2 on Said Plan, Containing 1 acre.
Being Parcel ID No. 27-00-00736-01.

## C.  JOHN R. PERSAUD

1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 17686 Circle Pond Court, Boca Raton, Florida, 33496, more particularly described as: All that certain land situate in Palm Beach County, State of Florida, viz: Lot 6 of FOX HILL ESTATES OF BOCA RATON, according to the Plat thereof, recorded in Plat Book 87, Page 4, of the Public Records of Palm Beach County, Florida.

2) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1458 Ocean Drive PH2, Miami Beach, Florida 33139, more particularly described as: The Condominium Parcel known as Residential Condominium Unit PH 2, of De Soleil South Beach Residential Condominium ("Condominium"), according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 25089, Page 2304 of Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto, and any and all amendments thereto.

3) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 4400 Highway A1A, Apt 20, Vero Beach, Florida 32963 located in Indian River County, Florida. Parcel Number 32-40-29-00007-0000-00020.0 recorded in Book 001666, Page 000137.

D. CHERI L. PERSAUD

1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 17686 Circle Pond Court, Boca Raton, Florida, 33496, more particularly described as: All that certain land situate in Palm Beach County, State of Florida, viz: Lot 6 of FOX HILL ESTATES OF BOCA RATON, according to the Plat thereof, recorded in Plat Book 87, Page 4, of the Public Records of Palm Beach County, Florida.

2) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1458 Ocean Drive PH2, Miami Beach, Florida 33139, more particularly described as: The Condominium Parcel known as Residential Condominium Unit PH 2, of De Soleil South Beach

Residential Condominium ("Condominium"), according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 25089, Page 2304 of Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto, and any and all amendments thereto.

3) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 4400 Highway A1A, Apt 20, Vero Beach, Florida 32963 located in Indian River County, Florida. Parcel Number 32-40-29-00007-0000-00020.0 recorded in Book 001666, Page 000137.

E. ANDREW WANG

1) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 8 Day Lily Drive, Mount Laurel, New Jersey 08054, more particularly described as: All That Certain tract or parcel of land and premises situate and being in the Township of Mount Laurel, County of Burlington and State of New Jersey. Beginning at a point in the Southwesterly line of Daylily Drive (60.00 feet wide) said point being Southeasterly a distance of 362.97 feet measured along the curved and tangent Southwesterly line of Daylily Drive from the Southerly end of a curve connecting same with the Southeasterly line of Elbo Lane, also known as County Route 612 as widened to 33.00 feet from the original center line a said connecting curve having a radius of 45.00 feet, said beginning point being in the division line between Lots 15 and 16, Block 804.03 as shown on the plan hereinafter mentioned and extending; thence 1) South 17 degrees 59 minutes 15 seconds along the Southwesterly line of Daylily Drive, a distance of 132.35 feet to a point; thence 2) South 72 degrees 00 minutes 45 seconds West along the division line between Lots 16 and 17, Block 804.03 of said plan, a distance of 302.02 feet to a point in the line of Lot 2.01, Block 8.02 of said plan; thence 3) North 17 degrees 59 minutes 15 seconds West along the division line between Lot 16, Block 804.03 and Lot 2.01, Block 8.02 of said plan, a distance of 132.35 feet to a point; thence 4) North 72 degrees 00 minutes 45 seconds East along the division line between Lot 15 and 16, Block 804.03 of said plan, a distance of 203.02 feet to the point and place of beginning. Being known as Lot 16, Block 804.03 as shown on Major Subdivision Plan, Laurel Ponds II, Section II, filed

58

in the Office in the Burlington County Clerk on November 20, 1992 as Map No. 05476.

2) All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1458 Ocean Drive PH20, Miami Beach, Florida 33139, more particularly described as:
The Condominium Parcel known as Residential Condominium Unit PH 20, of De Soleil South Beach Residential Condominium ("Condominium"), according to the Declaration of Condominium thereof ("Declaration"), recorded in Official Records Book 25089, Page 2304 of the Public Records of Miami-Dade County, Florida, together with an undivided share in the common elements appurtenant thereto, and any and all amendments thereto.

## 2. CONVEYANCES

### A. RICHARD A. HAGAN

1) 2004 Chrysler Pacifica 4 Door Wagon Sport Utility, VIN: 2C8GM68454R631043, Tag Number J20PRC

2) 2004 Dodge Ram 1500 Quad ST/SLT Crew Pickup, VIN: 1D7HA18D04S692516, Tag Number X66WHV

### B. JOHN R. PERSAUD

1) 2006 Honda Odyssey EX Sport Van, VIN: 5FNRL387X6B035866, Tag Number D432RY

### C. CHERI L. PERSAUD

1) 2004 Lexus GX 470 4 Door Wagon Sport Utility, VIN: JTJBT20X640035878, Tag Number X84GGJ

2) 2005 Lexus LS 430 Sedan 4 Door, VIN: JTHBN 36F555004092, Tag Number H82ULA

## 3. PRECIOUS GEMSTONES, PRECIOUS METALS AND JEWELRY

### A. JOHN R. and/or CHERI L. PERSAUD

1) Jasmine de Nuit necklace in 18k yellow gold, (4.08 cts. sapphire) 1.07 cts. (diamonds) purchased on December 15, 2006, from Kaufmann de Suisse, Palm Beach, Florida

2) Jasmine de Nuit necklace in 18k white gold with 3.62 cts. sapphires, 1.13 cts. of diamonds purchased on December 15, 2006, from Kaufmann de Suisse, Palm Beach, Florida

3) Fancy light yellow 4.81 cts. set with 0.20 cts. of diamonds, #21280 purchased on May 19, 2004, from Kaufmann de Suisse, Palm Beach, Florida.

## 4. BANK ACCOUNTS

All United States currency funds or other monetary instruments credited to:

A. USAA Federal Savings Bank Account #03664570 in the name of Brian & Paula Renneisen

B. Wells Fargo Bank Account #7045649519 in the name of ABL Global, Inc.

C. Wells Fargo Bank Account #0374674315 in the name of ABL Global, Inc.

D. Edward Jones Account #96808241 in the name of ABL Global, Inc.

E. Edward Jones Account #96806155 in the name of Brian & Paula Renneisen

F. Edward Jones Account #96892277 in the name of Brian Renneisen

G. Bank of America Account #003766053709 in the name of Cheri L. Persaud

H. Bank of America Account #005493998520 in the name of UKP, LLC.

I. Charles Schwab Account #30704688 in the name of UKP, LLC.

J. Bank of America Account #005493998274 in the name of Glenmary Corporation

K. Florida Business Bank Account #10004262 in the name of Classic Muscle Car Superstore

L. Bank of America Account #003671623169 in the name of PBS Global, Inc.

M. Charles Schwab Account # 91436123 in the name of Sara Wang

N. Charles Schwab Account #31638785 in the name of Nancy Clark

O. Bank of America Account #003938926402 in the name of OIGNA, Inc.

P. Ameriprise Financial Accounts:

- Riversource Life Insurance, Policy Number 5405 6742 021, in the name of PBS Global, Inc.,

- Riversource Life Insurance, Policy Number 9000 0758 6949, in the name of John Persaud,

- Riversource Life Insurance, Policy Number 9000 0758 7033 in the name of Richard Hagan,

- Riversource Life Insurance, Policy Number 9000 7587 047- in the name of Brian P. Renneisen,

- Riversource Life Insurance , Policy Number 9000 7392 051 5, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number  0909 0732 8654 6 004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 0931 0732 9230 8 004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 0191-4167053-013, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9000-7392051-004, in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9000 7586 949 6 in the name of John R. Persaud,

- Riversource Life Insurance , Policy Number 9090 7328654 004, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0909 0734 3357 7 004, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0931 0732 9234 0 004, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0191 4167053 013,  in the name of Cheri L. Persaud,

- Ameriprise Financial Services, Account Number 0000 3376 1016 021, in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number, 0400-0451700-040  in the name of Cheri L. Persaud,

- Riversource Life Insurance , Policy Number 0190-1843658-098,  in the name of Cheri L. Persaud,

- Ameriprise Financial Services, Account Number 3327 9050 0 021, in the name of UKP, LLC., and

- Ameriprise Financial Services, Account Number 0490-1762338-098, in the name of UKP, LLC.

A TRUE BILL

3-5-08

DATE                                    FOREMAN OF THE GRAND JURY

ERIC F. MELGREN
United States Attorney
District of Kansas
1200 Epic Center, 301 N. Main
Wichita, Kansas 67202
(316) 269-6481
Ks. S. Ct. No. 12430

(It is requested that trial be held in Wichita, Kansas.)

Returned in open court this 5th day of March, 2008.

UNITED STATES DISTRICT JUDGE